IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

ADEL M. ABDELHAMID,                    )
                                       )
              Plaintiff,               )
                                       )
        v.                             )        1:20-cv-408 (LMB/TCB)
                                       )
SECRETARY OF THE NAVY, et al.,         )
                                       )
              Defendants.              )

MEMORANDUM OPINION

Before the Court is a Motion to Dismiss and for Summary Judgment ("Motion") filed by

defendants Thomas W. Harker, in his official capacity as the Acting Secretary of the Navy ("the

Secretary"), the U.S. Department of the Navy, the Naval Criminal Investigative Service

("NCIS"), and Special Agent Omar Lopez, in his official capacity as the Director of NCIS

("defendants"). [Dkt. No. 9]. The Motion, which pro se plaintiff Adel M. Abdelhamid

("Abdelhamid" or "plaintiff") opposes, has been fully briefed. Finding that oral argument would

not assist the decisional process, the Motion will be resolved on the materials filed by the parties.

Those materials include the approximately 850 pages of attachments plaintiff included with the

Complaint, most of which are taken from the report of investigation prepared by NCIS in

response to plaintiff's EEO Complaint. Defendants also attached dozens of additional pages of

the administrative record to their Motion. For the reasons that follow, defendants' Motion will be

granted.

I. BACKGROUND

A. **Factual Background**

Plaintiff, who identifies as an "Egyptian-Arab/American" of the Muslim faith, was hired

by NCIS on December 11, 2009 for the position of Intelligence Operations Specialist. [Dkt. No.

1] at 2; [Dkt. No. 1-5] at 2. NCIS is a civil law enforcement agency which, among other activities, is responsible for investigating felonies committed on Navy and Marine Corps bases. NCIS is headquartered in Quantico, Virginia, but maintains field offices around the world. When plaintiff was hired, he was assigned to the Criminal Investigations unit in the Middle East Field Office, which is located in the Kingdom of Bahrain. [Dkt. No. 1-5] at 2. Between October 2017 and October 2018, his first level supervisor was Supervisory Special Agent Sharon Justice ("Justice") and his second level supervisor was Senior Intelligence Officer Joshua Verbout ("Verbout"). After Justice was reassigned in October of 2018, Verbout served as plaintiff's first level supervisor in an acting capacity. [Dkt. No. 1-5] at 51. The Criminal Investigations unit was under the general supervision of Assistant Special Agent in Charge Chad Slagle ("Slagle"); however, Slagle was not directly in plaintiff's chain of command. [Dkt. No. 1] at 11. The entire Middle East Field Office was overseen by the Special Agent in Charge, a position which was occupied by Suzann Gallagher from 2017 until August of 2018, and by Bradley Duckworth ("Duckworth") between August 2018 and the end of 2019. [Dkt. No. 1-3] at 84-96.

      1.  <u>Issues related to plaintiff's supervisors</u>

      Plaintiff alleges that beginning in October of 2017, Slagle began to "target" certain members of the Criminal Investigations unit, including plaintiff, by placing increased scrutiny on their work performance and lobbying Justice to discipline them in spite of the targeted employees not being in Slagle's direct chain of command. [Dkt. No. 1] at 7-8; [Dkt. No. 1-3] at 31; [Dkt. No. 1-4] at 12. Both Verbout and Justice confirmed this allegation during the administrative proceeding. For example, Verbout recalled that in April and May of 2018, Slagle pushed him to discipline plaintiff for providing inaccurate information to a Navy lawyer in an email and for misusing his NCIS vehicle. Verbout did not think either issue merited discipline

2

and supported the decision of Justice—plaintiff's first-line supervisor—only to counsel plaintiff on each incident informally. [Dkt. No. 1-3] at 53. Justice reported additional instances in which Slagle pressured her to discipline plaintiff, for, among other acts, not developing certain contacts with the local police to Slagle's satisfaction and for not fully supporting "the criminal investigations squad during duty calls." [Dkt. No. 1-3] at 31. Justice believed that by repeatedly asking her to discipline plaintiff, Slagle was "tr[ying] to manipulate" her "to start a paper trail to develop a picture that [plaintiff] was not capable of doing his job."[1] [Dkt. No. 1-3] at 32.  In spite of Slagle's efforts, Justice "did not discipline [plaintiff] while [she] worked as his first-line supervisor." Id. at 32. There is also no indication in the record that Verbout disciplined plaintiff while he acted as plaintiff's first-line supervisor after Justice's departure.

As plaintiff's first-line supervisor, Justice was responsible for recommending that he attend meetings or training opportunities, but Slagle was responsible for approving her recommendations. [Dkt. No. 1-3] at 32. According to Justice, Slagle did not allow her to recommend that plaintiff attend a July 15, 2018 meeting ("July 2018 Meeting") to discuss human trafficking with local Bahraini police officials. Instead, Slagle made the decision to send two junior agents.[2] Justice and plaintiff had attended an earlier meeting with local police on the same subject at which they had "paved the way … so that [NCIS] would be able to meet with the

[1] In September of 2018, Justice made her own complaint to NCIS management about Slagle. That Complaint resulted in a Management Directed Inquiry conducted by a special agent from NCIS headquarters. The inquiry investigated claims involving "Discrimination against or mistreatment of employees on the basis of their gender; Leadership decisions with regard to personnel assignments and authority; and the Creation of a hostile work environment." [Dkt. No. 10-4] at 83. Plaintiff was interviewed as part of this inquiry on September 26, 2018. According to the investigative action report, plaintiff reported that there was "not a good working environment" since Slagle started "micromanaging" his unit, but he also stated that "he [had] not been spoken to in a demeaning or intimidating way" by Slagle.

[2] These two agents—Greg Stephens and Alyse Aceto-Stephens, who were married—were white Americans.

higher level of police that worked" on human trafficking issues, and Justice had specifically asked Slagle if they could attend the July 2018 Meeting. [Dkt. No. 1-3] at 33-34. According to Justice, Slagle's decision that plaintiff could not attend the July 2018 Meeting was part of a pattern of Slagle "target[ing]" plaintiff, which she believed was "based on his national origin." Id. She came to that conclusion because Slagle had previously told her that plaintiff "always looked dirty" and "could not speak proper English," comments which she did not share with plaintiff at the time. [Dkt. No. 1-3] at 34. There is no evidence in the record that plaintiff's hygiene or ability to speak English were legitimate issues with his work performance. In his Complaint, plaintiff has defended his language skills by pointing out that he was required to take yearly proctored language exams as part of his work requirements. [Dkt. No. 1] at 9.

On November 19, 2018, Verbout sent an email to employees in the Criminal Investigations unit, among others, requesting that they provide at least a week's notice if they intended to request leave. [Dkt. No. 1-6] at 39; [Dkt. No. 1-3] at 60-61. Although plaintiff has alleged that this email "was directly targeting him," [Dkt. No. 1] at 41, it was in fact sent after another employee, Mostafa Karimi, requested leave coinciding with the end of Ramadan only one or two days before the date requested. Karimi explained to Verbout that "Muslim Holidays coincide with the lunar calendar and that the day of the holiday is not known until Ramadan is officially over, marking the observation of the new moon." [Dkt. No. 1-3] at 60; [Dkt. No. 1-4] at 37. Although Verbout granted Karimi's leave request, he followed up with the email to all his supervisees, in which he stated: "I understand there are some very important non-US holidays that are not confirmed until a few days prior. That said, we generally know when they occur year-to-year and you know if you are planning to take off. So, in anticipation of that, please provide me at least a week's notice of your intent to take leave." [Dkt. No. 1-6] at 39. According

to plaintiff, after he received Verbout's email, he was discouraged from requesting leave to
observe the Muslim holiday. [Dkt. No. 1] at 41; see also [Dkt. No. 1-4] at 38.

On December 30, 2018, plaintiff received his end of year evaluation. The evaluation was
reflected on a standardized performance evaluation form and was part of the annual assessment
of NCIS employees. After reviewing the form with the employee, the form is entered into the
Defense Civilian Intelligence Personnel System ("DCIPS"). Justice was plaintiff's immediate
rating official, and Verbout was his senior rating official, with Verbout taking over for Justice as
immediate rating official after her departure in October of 2018. [Dkt. No. 1-3] at 61. For the
2018 rating period (which ran from October 1, 2017 through September 30, 2018), plaintiff
received an overall score of 3.3, which corresponds to "Successful." [Dkt. No. 10-2]; [Dkt. No.
1-3] at 62. This was a 0.3 drop from plaintiff's 2017 evaluation, on which he received an overall
score of 3.6, which corresponds to "Excellent." The same two rating officials were involved in
both evaluations. [Dkt. No. 10-3]. Verbout has explained that he gave plaintiff an overall score
of 3.3 because although plaintiff "continued to support the criminal investigations team
effectively," he had made only "limited efforts to expand his liaison network in Bahrain" and had
not made a significant impact outside of his work unit. [Dkt. No. 1-3] at 62. These comments are
consistent with Justice's assessment of plaintiff's 2018 performance. As she has explained,
during plaintiff's midyear performance review in April of 2018, she and Verbout identified
"Liaison and Engagement" as "improvement areas" for plaintiff, and that even after plaintiff had
been made aware that he needed to improve in those areas, he failed to "develop contacts and to
start frequent visits with any police station outside" of the one with which he was already
familiar. [Dkt. No. 1-3] at 39. Because plaintiff had not improved in the areas about which

Justice and Verbout had counseled him in his mid-year performance review, Justice "concurred

with Mr. Verbout to give [plaintiff] a lower rating [than] his previous year." Id.

Verbout was also the senior rater responsible for plaintiff's 2019 performance evaluation.

As part of his April 2019 midyear performance review, plaintiff needed to complete a self-

assessment, which Verbout would review before it was submitted into the DCIPS. On April 3,

2019, after seeing plaintiff's draft self-evaluation, Verbout sent plaintiff an email in which he

made recommendations for how plaintiff could strengthen his self-assessment, describing

specific information plaintiff should include. [Dkt. No. 1-7] at 199. Verbout advised plaintiff that

he needed "to provide examples of how [he] achieved" certain required elements, and that it was

"not enough to just say [he] accomplished them (basically regurgitating the [performance

evaluation] text)." Id. Verbout explained that plaintiff was "on the right track," but needed to

"show how [he was] working towards accomplishments by the end of the year." Id. Plaintiff

responded to Verbout's email by thanking him for his feedback; however, he also expressed

significant umbrage at how Verbout had expressed that feedback:

> Sir, I am respectfully requesting that you please stop your aggressive hostility and
> offensive verbiage towards me. For you to say in your email that I am regurgitating
> my assessment is hostile, insulting, degrading and unprofessional. I have never
> addressed someone in this provoking manner nor have I ever been addressed by
> others in this manner, so I am asking you to please address me in a professional
> manner as your subordinate employee. I have always treated you with respect and
> I am just asking for the same curtesy [sic]. Thank You.

Id. at 120. Verbout responded that he appreciated plaintiff's concerns and was happy to discuss

them at their planned meeting to go over the evaluation. Verbout concluded by telling plaintiff

that the "[b]ottom line is that [he was] making positive strides" and that Verbout's "hope [was]

to better highlight that work in [plaintiff's] self-assessment." [Dkt. No. 10-4].

2.  <u>The decision not to re-authorize plaintiff's posting abroad</u>

When plaintiff was first hired at NCIS, he signed a "Mobility Agreement," in which he

"agree[d] to accept geographic relocation according to the requirements of NCIS with due

consideration of the employee's geographic preferences, qualifications, performance record,

career development, and time in place." [Dkt. No. 1-5] at 3 (capitalization omitted). The

Mobility Agreement stated that although the employee's preferences would be considered, "the

needs of the service are paramount." <u>Id.</u> NCIS personnel assigned to positions outside the United

States which are subject to Mobility Agreements do not generally remain abroad permanently;

instead, the foreign posting expires after a set period, and the employee can request an extension

if he or she wishes to remain abroad. <u>See, e.g.,</u> [Dkt. No. 1-3] at 88. Plaintiff's posting as an

Intelligence Operations Specialist to the Middle East Field Office was reauthorized for several

additional 12- or 24-month terms between 2009 and 2019. [Dkt. No. 10-1].

When Duckworth became the Special Agent in Charge of the Middle East Field Office in

August of 2018, he "conducted an assessment to determine areas where capabilities could be

added to improve [the office's] ability to accomplish [its] mission." [Dkt. No. 1-3] at 90.

Duckworth oversaw four operational/investigative squads, each focused on a specific area:

transnational crimes, general crimes, CI investigations, and CI ops. According to Verbout, "[t]he

only squad with a significant number of investigations and ops, and absolutely no dedicated

analytic support[,] was the general criminal investigations squad." [Dkt. No. 1-3] at 56. As an

Intelligence Operations Specialist assigned to the general criminal investigations squad, plaintiff

was a collector of information, not an analyst. <u>Id.</u> Duckworth requested that a position for an

analyst be added to the squad, but there were no vacant positions which could be reassigned;

accordingly, Duckworth determined that an existing operations specialist position would have to

be converted to an analyst position. Id. Because the analyst position would be in the Criminal Investigations unit, plaintiff's position was chosen for conversion. Id. Before coming to this decision, Duckworth consulted with three senior officials in charge of Atlantic Operations for NCIS,[3] and with NCIS Deputy Assistant Director Megan Bolduc; he did not consult with either Verbout or Slagle. Id.

The term of service plaintiff was serving during the 2017-2019 period was set to expire in September 2019. Through an email sent on October 9, 2018, he requested another extension of his posting in Bahrain, [Dkt. No. 1-5] at 65; however, because Duckworth had decided to convert plaintiff's position to an analyst position, plaintiff's request was denied. Plaintiff learned that his request was denied in a phone call from Verbout on November 6, 2018, while plaintiff was in the United States completing a training program. [Dkt. No. 1-3] at 56-57. On November 11, 2018, plaintiff sent an email to Duckworth in which he stated that he intended to file an EEO complaint "against ... Verbout next week," alleging that the decision not to reauthorize his posting abroad was being carried out in retaliation for his participation in the Management Directed Inquiry conducted after Justice filed a complaint against Slagle. [Dkt. No. 1-5] at 83-85. Duckworth had a meeting with plaintiff on November 13 to discuss plaintiff's allegation. At that meeting, plaintiff was informed that his operations specialist position was being converted to an analyst position.

In early 2019, NCIS deputy assistant director Bolduc instructed Duckworth and Verbout to reach out to plaintiff about the possibility of having him complete additional training as an intelligence analyst, so that he could fill the converted analyst position. [Dkt. No. 1-3] at 57. On

---

[3] These officials were two Assistant Directors of Atlantic Operations, Jeremy Gauthier and Jon Jenckerson, and Senior Intelligence Officer Dan Poche. [Dkt. No. 103] at 90. The Middle East Field Office was part of Atlantic Operations.

February 27, 2019, Verbout sent plaintiff a "tentative training plan" laying out the courses that plaintiff would likely need to take in order to stay on as an analyst, noting that the "bulk of the databases listed can be taught via deskside training." [Dkt. No. 10-4] at 2-4. On March 3, 2019, plaintiff sent an email declining this offer and expressing his intention to go through with his relocation to NCIS headquarters in the United States. [Dkt. No. 1-3] at 57. Ultimately, plaintiff requested an early transfer to the United States before his position expired in September 2019 to ensure that his children were timely enrolled in school in the United States. [Dkt. No. 1] at 65. Plaintiff is still employed by NCIS.

### B. Procedural History

On November 14, 2018, plaintiff first contacted the NCIS EEO office to raise his allegations of discrimination and harassment. [Dkt. No. 1] at 36. Plaintiff filed a formal EEO complaint on March 3, 2019, alleging discrimination on the basis of race, national origin, and religion, and retaliation. Id. at 92; [Dkt. No. 10-4] at 46. NCIS's EEO office conducted an extensive investigation into plaintiff's claims, and in August of 2019 issued an investigative report consisting of more than 1000 pages of declarations and evidence. Plaintiff took issue with the thoroughness and accuracy of the report, and withdrew his complaint from further administrative proceedings. [Dkt. No. 1] at 98. As a result, the investigation did not reach a final decision. Plaintiff timely filed this civil action on April 14, 2020. In addition to opposing defendants' Motion to Dismiss and for Summary Judgment, plaintiff has also filed a Motion for Leave to Amend Complaint. [Dkt. No. 16].[4]

---

[4] Plaintiff's first opposition was stricken from the record because—at 104 pages, with 749 pages of attachments—it exceeded the page limit allowed by this district's Local Rules. See [Dkt. No. 19]. Plaintiff then filed an amended opposition, attaching an additional 237 pages of exhibits.

## II. DISCUSSION

### A. <u>Motion for Leave to Amend</u>

Federal Rule of Civil Procedure 15(a)(2) provides that courts "should freely give leave" to amend a pleading "when justice so requires." Leave to amend should only be denied when "the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." <u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 242 (4th Cir. 1999) (quoting <u>Johnson v. Oroweat Foods Co.</u>, 785 F.2d 503, 509 (4th Cir. 1986)).

Plaintiff's original Complaint consists of 90 pages of single-spaced text written in ten-point font, and includes over 800 pages of attachments from the EEO investigative report; however, it does not include individual counts linking the many facts presented with specific causes of action. [Dkt. No. 1]. As a result, it is very difficult to identify specific discrimination claims; however, in their Motion, defendants have focused on five "discrete acts" which have appropriately characterized the acts of discrimination and retaliation about which plaintiff is complaining: (1) Slagle's efforts to get Justice to discipline plaintiff; (2) Slagle's refusal to let plaintiff attend the July 2018 Meeting; (3) the decision not to reauthorize plaintiff's posting abroad; (4) Verbout's rating plaintiff as "Successful" rather than "Excellent" in his 2018 performance evaluation; and (5) Verbout's comments about plaintiff's 2019 midyear self-assessment. [Dkt. No. 10] at 11-12. Defendants have also "presumed that plaintiff seeks to present a claim for hostile work environment." <u>Id.</u>[5]

---

[5] In addition to traditional substantive Title VII claims, plaintiff's Complaint also discusses at length his problems with the thoroughness and legitimacy of the administrative investigation responding to his EEO complaint. According to plaintiff, he was "subjected to NCIS EEO officials unlawfully breaking confidentiality by informing and giving details to discriminatory officials of [his] filing of an EEO complaint without [his] verbal or written consent," and was also "subjected to continuous neglect and oversite [sic] by NCIS EEO official's [sic] refusal to

In his opposition to the Motion, plaintiff rejects defendants' attempt to identify specific counts, asserting instead that each of the 190 paragraphs in the Complaint is a "discrete act" to which the defendants "could have simply responded in numerical order." [Dkt. No. 22] at 3. Plaintiff's position is unreasonable, considering that many of the numbered paragraphs in the Complaint simply state background information, such as that plaintiff was hired by NCIS and the dates when various individuals first started working in the Middle East Field Office. See, e.g., [Dkt. No. 1] at ¶¶ 1-6; see also [Dkt. No. 22] at 8 (plaintiff listing by number the paragraphs in the Complaint which he considers to allege "background information for this Courts [sic] edification"). Plaintiff also purports to have identified "specific counts of discrimination and causes of action" in Exhibit B to his amended opposition; however, Exhibit B simply re-packages the facts already alleged in the Complaint, weaving in legal argument throughout. [Dkt. No. 22-2]. The result is a 16-page single-spaced supplemental brief which violates this Court's Order that plaintiff file an opposition not to exceed 30 pages, and which does not clarify the specific causes of action being alleged by plaintiff.

Before filing his amended opposition, plaintiff filed a Motion for Leave to Amend Complaint. Although he did not attach a proposed amended complaint, he offered that he would be willing to do so "if this Court deems it necessary." [Dkt. No. 16]. Considering the extensive record already before the Court, any such further amendment would be futile. The discrete acts

---

issue [him] the Rights and Responsibilities and instructions as instructed by the EEOC not once, but on six (6) separate occasions." [Dkt. No. 1] at 2-3. Dissatisfaction with the processing of an EEO complaint is not the basis of a valid claim for relief. See 29 C.F.R. § 1614.107 (directing that agencies must dismiss any complaint "[t]hat alleges dissatisfaction with the processing of a previously filed complaint"). Similarly, to the extent that plaintiff is attempting to allege state law claims including breach of contract or forgery with respect to his federal employment documents, such claims are not cognizable against the federal government when they arise out of the federal employment relationship. See Nguyen v. U.S. Dep't Defense, 39 F.3d 1178 (4th Cir. 1994).

identified by defendants are consistent with those that were the focus of the EEO investigation, and they accurately present the most plausible causes of action contained within the myriad facts that plaintiff has alleged in his Complaint. Accordingly, the Motion for Leave to Amend Complaint will be denied as futile.

### B. Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) requires dismissal of a complaint when a "plaintiff's allegations fail to state a claim upon which relief can be granted." Adams v. NaphCare, Inc., 244 F. Supp. 3d 546, 548 (E.D. Va. 2017). A complaint must be more than speculative, and must "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007). Defendants argue that although plaintiff has named four separate defendants in this action, the only proper defendant is the Secretary of the Navy. Title VII provides that where a plaintiff's complaint is based on federal employment, "the head of the department, agency, or unit, as appropriate, shall be the defendant." 42 U.S.C. § 2000e-16(c). As NCIS operates "within the Department of the Navy,"[6] the Secretary of the Navy—as the head of the department—is the proper defendant. Accordingly, the Complaint does not state a claim for which relief could be granted against the United States Navy, NCIS, or the Director of NCIS, and they will be dismissed from this civil action.

### C. Motion for Summary Judgment

A court may convert a motion to dismiss to a motion for summary judgment "when matters outside the pleadings are submitted … and all parties [are] given reasonable opportunity to present all material" that would be relevant to summary judgment. Gay v. Wall, 761 F.2d 175, 177 (4th Cir. 1985). "In interpreting the requirements of this rule," the Fourth Circuit "has held

---

[6] See https://www.ncis.navy.mil/About-NCIS/ (last visited Mar. 4, 2021).

that the term 'reasonable opportunity' requires that all parties be given some indication by the court ... that it is treating the 12(b)(6) motion as a motion for summary judgment, with the consequent right in the opposing party to file counter affidavits or pursue reasonable discovery." Id. (internal citations and quotation marks omitted). Defendants' Motion put plaintiff on notice that the Secretary was seeking summary judgment by including that remedy in its title as well as in its arguments. Plaintiff objects that treating the Motion as one for summary judgment would "deny [him] due process and discovery of evidence that will further confirm [his] claims," [Dkt. No. 22] at 2; however, he does not identify any specific discovery that is needed to supplement the approximately 1000 pages of witness statements and documentary evidence that has already been developed. The Fourth Circuit has held that in the federal employment context, where the administrative record is before the district court and the plaintiff has not identified specific discovery that is lacking, it is appropriate to decide a motion for summary judgment on that record. See Amirmokri v. Abraham, 266 F. App'x 274, 281-82 (4th Cir. 2008); Boyd v. Guiterrez, 214 F. App'x 322, 323 (4th Cir. 2007). For these reasons, the portion of defendants' Motion seeking summary judgment will be considered.

Summary judgment must be granted where "there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law." Norfolk S. Ry. Co. v. City of Alexandria, 608 F.3d 150, 156 (4th Cir. 2010) (quoting Fed. R. Civ. P. 56). A genuine dispute about a material fact exists if "after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party." Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012). All inferences must be made in favor of the nonmoving party, Hawkins v. McMillan, 670 F. App'x 167, 168 (4th Cir. 2016); however, if the nonmoving

party's evidence is "merely colorable" or "not significantly probative," then summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

     1.  Discrimination and Retaliation

"All personnel actions affecting employees … in military departments … shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). To survive summary judgment on a discrimination claim, a federal employee must either offer direct evidence of discrimination, or show that (1) he is a member of a protected class; (2) he suffered an adverse personnel action; and (3) the adverse personnel action occurred under circumstances giving rise to an inference of discrimination. Purchase v. Astrue, 324 F. App'x 239, 241-242 (4th Cir. 2009) (citing Thompson v. Potomac Elec. Power Co., 312 F.3d 645 (4th Cir. 2002)). To establish a prima facie case for retaliation, a plaintiff must show "(1) that he engaged in a protected activity; (2) that his employer took an adverse employment action against him; and (3) that a causal connection existed between the protected activity and the asserted adverse action." King v. Rumsfeld, 328 F.3d 145, 150-151 (4th Cir. 2003). If a plaintiff establishes a prima facie case for discrimination or retaliation, the burden shifts to the employer to establish a non-discriminatory or non-retaliatory motive; if the employer does so, the burden shifts back to the plaintiff to show that the proffered motive is pretextual. Purchase, 324 F. App'x at 241; King, 326 F.3d at 150 (citing McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973)).

     Plaintiff alleges that he was discriminated against on the basis of his race, national origin, and religion, and that he was retaliated against based on his cooperation as a witness with the Management Directed Inquiry that resulted from Justice's September 2018 complaint against Slagle. He also alleges retaliation based on his own EEO activity beginning in November 2018.

[Dkt. No. 1] at 1-2; see also [Dkt. No. 10-4] at 82-85. As explained previously, the defendants have identified five discrete actions that could plausibly form the basis of plaintiff's discrimination or retaliation claims. As to the first two—Slagle's attempts to have plaintiff disciplined and his decision that plaintiff could not attend the July 2018 Meeting—the Secretary argues that any claims of discrimination or retaliation are time-barred.

A federal employee who believes that he has been discriminated against must "consult a Counselor prior to filing a complaint in order to try to informally resolve the matter." 29 C.F.R. § 1614.105(a). Contact with the EEO counselor must be initiated "within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." Id. In the Complaint, plaintiff identified two specific incidents when Slagle tried to have him disciplined: an April 9, 2018 meeting between Slagle and Verbout when Slagle accused plaintiff of sending inaccurate information to a Navy lawyer, and a May 8, 2018 meeting between Slagle and Verbout when Slagle accused plaintiff of misusing his government vehicle. See [Dkt. No. 1] at 11-12; [Dkt. No. 1-3] at 29-32. Plaintiff also alleges Slagle refused to allow him to attend the meeting in July of 2018. [Dkt. No. 1] at 15. All of these events occurred more than 45 says before plaintiff first communicated with an EEO counselor on November 14, 2018, [Dkt. No. 1] at 36, and they are time-barred unless plaintiff can show he is entitled to equitable tolling of that time limit.

"Equitable tolling has long been considered an extraordinary remedy in this circuit, and litigants face a considerable burden to demonstrate that it applies." CVLR Performance Horses, Inc. v. Wynne, 792 F.3d 469, 476 (4th Cir. 2015). Generally, the doctrine applies where (1) the plaintiff was "induced or tricked by his adversary's misconduct into allowing the filing deadline to pass," or (2) "extraordinary circumstances beyond the plaintiffs' control made it impossible to

file the claims on time." Crabill v. Charlotte Mecklenburg Bd. of Educ., 423 F. App'x 314, 321

(4th Cir. 2011) (quoting Harris v. Hutchinson, 209 F.3d 325, 330 (4th Cir. 2000)) (quotation

marks omitted). In his opposition, plaintiff has not cited to any misconduct by the Secretary or

any other extraordinary circumstances that would support equitable tolling. Instead, plaintiff

argues that viewing these claims as time-barred is inappropriate because he has asserted a hostile

work environment claim, [Dkt. No. 22] at 2-3; however, because the Secretary has only argued

that these allegations are untimely as the bases for plaintiff's discrimination and retaliation

claims, plaintiff's reliance on his hostile work environment claim cannot stave off summary

judgment as to these claims.

The remaining, timely-exhausted claims identified by the Secretary are the decision not

to reauthorize plaintiff's posting abroad; his 2018 performance evaluation conducted by Verbout;

Verbout's comments about his 2019 self-assessment, and Verbout's November 2018 email

expressing his policy for leave requests, which the administrative investigation addressed as the

basis for plaintiff's claim of religious discrimination. For these actions to serve as the basis for

discrimination or retaliation claims, they must be "personnel actions" under the meaning of Title

VII. See 42 U.S.C. § 2000e-16(a). The Fourth Circuit has applied the same standard to determine

an actionable "personnel action" for a federal employee as it has used to identify "adverse

employment actions" by non-government employers: "An adverse action is one that 'constitutes

a significant change in employment status, such as hiring, firing, failing to promote,

reassignment with significantly different responsibilities, or a decision causing a significant

change in benefits.'" Hoyle v. Freightliner, LLC, 650 F.3d 321, 337 (4th Cir. 2011) (quoting

Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)); Boone v. Goldin, 178 F.3d 253,

256 (4th Cir. 1999). Under this standard, none of the actions taken by plaintiff's employer could

serve as the basis for a discrimination or retaliation claim, because none had an adverse effect on plaintiff's employment status. Even the denial of plaintiff's request to extend his Middle East posting did not result in "significantly different responsibilities" or a "significant change in his employment status." See Boone, 178 F.3d at 255-56 ("Although [plaintiff] may have experienced increased stress in the new job … reassignment can only form the basis of a valid Title VII claim if the plaintiff can show that the reassignment had some significant detrimental effect."); James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 377 (4th Cir. 2004) ("[A] poor performance evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." (internal citation omitted)).

   As defendant correctly recognizes, the United States Supreme Court has recently signaled that the federal-sector term "personnel action" should be interpreted more broadly than its private-sector counterpart "employment action." In Babb v. Wilkie, a case involving the federal-sector version of the ADEA, the Court observed in dicta that, although "personnel action" was not defined in the ADEA, its "meaning is easy to understand" by reference to the Civil Service Reform Act of 1978 ("CSRA"). 140 S. Ct. 1168, 1173 (2020). The CSRA provides a list of "personnel actions," including among others appointment, promotion, transfer, reassignment, and performance evaluations, regardless of the impact they have on the employee's job responsibilities. 5 U.S.C. § 2302(a)(2). Although it is unclear whether this more inclusive definition of "personnel action" applies to Title VII claims, neither Verbout's constructive criticism of plaintiff's non-final self-assessment nor his email expressing an office-wide leave policy would qualify as personnel actions. Therefore, neither of these acts support plaintiff's discrimination or retaliation claims.

On the other hand, both plaintiff's 2018 performance evaluation and the decision not to reauthorize his term abroad would qualify as personnel actions under the broader definition. Even assuming this expanded definition of actionable personnel actions applies to Title VII cases, there is no evidence in this record, other than plaintiff's beliefs, that the relevant decisionmakers involved in his 2018 evaluation and the denial of his request to extend his assignment to the Middle East were motivated by either discriminatory or retaliatory animus. The only direct evidence of discrimination described in plaintiff's Complaint or the administrative record are Slagle's statements that plaintiff was dirty and could not speak English properly; however, there is no evidence that Slagle was involved in, or even consulted with respect to, either the contents of plaintiff's 2018 performance evaluation or the conversion of his position. See [Dkt. No. 1-3]. To the contrary, the unrefuted evidence is that Justice and Verbout conducted the 2018 performance evaluation. Both of these supervisors had protected plaintiff from Slagle by declining to discipline plaintiff when he asked them to, and Justice had recommended that plaintiff be allowed to attend the July 2018 Meeting. Moreover, it was the same senior rater, Verbout, who gave plaintiff the higher score in the previous year, which undercuts any argument that the lower score in 2018 was motivated by plaintiff's race, national origin, or religion.

There is also no evidence that would give rise to an inference that the 2018 performance evaluation was the product of retaliation. Although the evaluation was finalized after plaintiff's first contact with the EEO in November of 2018, other than the time frame between plaintiff contacting an EEO counselor and the slightly lower score on the performance evaluation, there is no evidence suggesting that the evaluation was done in retaliation for that contact. In addition, there cannot be any inference that the evaluation score was an effort to retaliate against plaintiff

for acting as a witness in the Management Directed Inquiry into Justice's complaint about Slagle, considering that it was Justice who filed that complaint, and Verbout cooperated with that investigation as a witness and confirmed many of Justice's allegations. [Dkt. No. 10-4] at 85. Even if there were any evidence giving rise to inferences of discrimination or retaliation, the Secretary has identified a non-discriminatory, non-retaliatory reason for plaintiff's 2018 rating of "Successful," instead of the "Excellent" rating he received in 2017. Both Verbout and Justice stated in their sworn declarations that the two categories in which plaintiff's performance evaluation suffered in 2018 as compared to 2017 were areas that they had previously advised plaintiff needed improvement, and in which he had not significantly improved. [Dkt. No. 1-3] at 39, 62. Nothing in the record indicates that Verbout's and Justice's explanations are pretextual.

The same analysis applies to the decision not to reauthorize plaintiff's assignment to the Middle East Field Office: there is no evidence that supports an inference of either discrimination or retaliation, and even if there were such evidence, plaintiff has not shown that the non-discriminatory motivation proffered by the Secretary was pretextual. An inference of discrimination is not appropriate, because the record shows that three employees sharing plaintiff's protected characteristics—Mustafa Karimi, Khaled Matahen, and Abdulhafiz Okosh—had their overseas positions extended by the same decisionmakers, at the same time that plaintiff's extension was not reauthorized. See [Dkt. No. 1-3] at 89; [Dkt. No. 10-3] at 36. An inference of retaliation is similarly unwarranted, because the decision not to re-authorize plaintiff's assignment was finalized before plaintiff made his first EEO contact. The only other possible protected activity in which plaintiff was involved was as a witness in the Management Directed Inquiry; however, 22 other employees in the Middle East Field Office were also interviewed as witnesses for that inquiry, and there is no evidence in the record that they suffered

19

any personnel actions in retaliation for their cooperation. Id. at 83. In fact, when Duckworth was asked about his knowledge of protected activity that plaintiff had participated in, he identified only the November 2018 EEO complaint, and there is no evidence beyond plaintiff's bare assertions that Duckworth or the other senior NCIS officials who decided to convert plaintiff's position to an analyst position even knew of his cooperation with the Management Directed Inquiry. See [Dkt. No. 1-3] at 85. Finally, the evidence clearly establishes a non-discriminatory, non-retaliatory explanation for the decision not to re-authorize plaintiff's foreign posting. Duckworth stated that the decision to convert plaintiff's position to an analyst position rather than keep it as an operations specialist position was made based on the overall performance objectives of the office. Id. at 90. Lastly, and as very strong evidence that they harbored neither discriminatory nor retaliatory animus toward plaintiff, senior NCIS officials, including Duckworth and Verbout, offered plaintiff the opportunity to remain in the converted position if he took them up on the training offer. Had plaintiff accepted that offer, he would have remained in Bahrain. This is unassailable evidence that the needs of the office, rather than discriminatory or retaliatory animus, motivated the staffing change. Id. at 57.

In the many hundreds of pages of the administrative record before the Court, there is no indication that the well-documented justifications for the 2018 performance evaluation and the decision not to reauthorize plaintiff's assignment were mere pretext for discrimination against plaintiff based on his race, national origin, or religion, or for retaliating against him for engaging in protected activity. Accordingly, summary judgment will be granted in the Secretary's favor on plaintiff's claims of discrimination or retaliation.

2. Hostile Work Environment

To prevail on a hostile work environment claim under Title VII, plaintiff must show that (1) he was subjected to unwelcome conduct; (2) the conduct was motived by his race, national origin, or religion; (3) the conduct was "sufficiently severe or pervasive to alter [his] conditions of employment and to create an abusive work environment"; and (4) the unwelcome conduct could be imputed to his employer. Bhella v. England, 91 F. App'x 835, 845 (4th Cir. 2004). Of the many supervisors whose conduct plaintiff has characterized as creating a hostile work environment, the only hint of discriminatory animus is from Slagle, whose statements that plaintiff was dirty and unable to speak proper English could be viewed by a reasonable factfinder as derogatory stereotypes based on plaintiff's race or national origin.[7] Although Slagle's statements are evidence that his conduct could have been motivated by discrimination, establishing that Slagle made discriminatory remarks is not enough to succeed on a hostile work environment claim. See Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 754 (4th Cir. 1996) ("Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace.").

Even if plaintiff has alleged that he was subjected to unwelcome conduct motivated by discriminatory animus, he must have evidence that the conduct was "sufficiently severe or pervasive to alter [his] conditions of employment." Bhella, 91 F. App'x at 845. Such a finding is

---

[7] There is no evidence that Slagle made similar comments with respect to plaintiff's religion. The only incident plaintiff has alleged which touches his religion was the email that Verbout sent corresponding with the end of Ramadan, in which he asked employees to provide sufficient notice before asking for leave. [Dkt. No. 1-6] at 39. That email was not directed at plaintiff specifically, did not result in any denial of leave for religious holidays or otherwise, and according to Verbout was motivated by the non-discriminatory need to allocate work assignments efficiently. [Dkt. No. 1-3] at 60-61. No reasonable factfinder could find that this email showed any anti-Muslim bias, or that it created a hostile work environment based on anti-Muslim animus.

not supported by this record, which shows that what plaintiff describes as Slagle's targeting activity was inflicted on other employees in plaintiff's office, not just on plaintiff. See, e.g., [Dkt. No. 1] at 7-8. The actual actions taken by Slagle that were directed at plaintiff personally boil down to his attempts to have plaintiff disciplined for various perceived infractions, and his refusal to allow plaintiff to attend the July 2018 Meeting. Importantly, none of Slagle's attempts to have plaintiff disciplined actually resulted in disciplinary measures, as both Justice and Verbout chose to address them informally with plaintiff instead. [Dkt. No. 1-3] at 31-32, 53-54. Additionally, although Justice stated that attending the July 2018 Meeting "could affect [plaintiff's] ability to build on his liaison skills," one of the categories that resulted in his receiving a lower performance evaluation score in 2018 than in 2017, there is no evidence that the 0.3 differential in performance evaluation score actually had any effect on plaintiff's ability to do his job or on the conditions under which he was expected to do it.

There is little in the record to recommend Slagle's managerial style; however, not all "callous behavior by [one's] superiors" or "personality conflict[s] with [one's] supervisor" are actionable under Title VII. Perkins v. Int'l Paper Co., 936 F.3d 196, 208 (4th Cir. 2019) (internal citations and quotation marks omitted). Accordingly, because the evidence does not establish that plaintiff was subjected to discriminatory conduct so severe or pervasive that it altered the conditions of his employment, summary judgment will be granted to the Secretary on plaintiff's hostile work environment claim.

## III. CONCLUSION

For the reasons stated above, plaintiff's Motion for Leave to Amend will be denied; defendants' Motion to Dismiss and for Summary Judgment will be granted; and judgment will be entered in favor of the Secretary by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 12 day of March, 2021.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge